**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| CARL MARTIN, individually and on behalf of a class of persons similarly situated, and on behalf of the CareerBuilder, LLC 401(k) Plan, | : <br> : <br> : Complaint -- Class Action <br> : <br> : |
| Plaintiff, | : |
| vs. | : Case No. <br> : |
| CAREERBUILDER, LLC., UNKNOWN 401(k) PLAN COMMITTEE with each individual committee member identified as JOHN and JANE DOES 1-20, UNKNOWN MONITORING DEFENDANTS with individual members of the Unknown Monitoring Defendants identified as JOHN and JANE DOES 21-31 and UNKNOWN FIDUCIARIES with its individual member identified as JOHN and JANE DOES 32-42. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |
| Defendants. | : <br> : |

**COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT**
**INCOME SECURITY ACT OF 1974, AS AMENDED (ERISA)**

## I.     INTRODUCTION

1.      Plaintiff, Carl Martin, individually and on behalf of a class of all other persons similarly situated ("Plaintiff") in the CareerBuilder, LLC 401(k) Plan (the "Plan"), and on behalf of the Plan, brings this action for breach of fiduciary duty under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), against CareerBuilder, LLC ("CareerBuilder" or "Company"), Unknown 401(k) Plan Committee, with each individual member of the Committee identified as John or Jane Does 1-20 and the Unknown Monitoring Defendants with its individual members identified as John or Jane Does 21-31 and Unknown Fiduciaries with its individual members identified as John or Jane Does 32-

42.

2.     Throughout the Class Period (defined below), Defendants allowed the Plan's recordkeepers, ADP, LLC, ADP Broker Dealer and, as of January 1, 2018, the Plan's new recordkeeper, Empower, (hereinafter "Recordkeepers" or "ADP") and its investment advisor and/or trustee, Morgan Stanley Smith Barney (hereinafter "Advisor" or "Morgan Stanley"), to receive excessive and unreasonable compensation through: (1) direct "hard dollar" fees paid by the Plan to ADP and/or Morgan Stanley; (2) indirect "soft dollar" fees paid to ADP and/or Morgan Stanley by mutual funds added and maintained in the Plan to generate fees to ADP and/or Morgan Stanley; (3) fees collected directly by ADP and/or Morgan Stanley from mutual funds added and maintained in the Plan to generate fees to ADP and/or Morgan Stanley; and (4) float interest, access to a captive market for 401(k) rollover materials to Plan participants, and other forms of indirect compensation.

3.     In order to provide for these revenue streams, Defendants larded the Plan with excessively expensive mutual funds — to the exclusion of superior alternatives — which in turn paid ADP and/or Morgan Stanley out of the excessive fees they collected from Plan investments.

4.     These mutual funds collectively underperformed superior alternative funds for a variety of reasons, including the fact that the alternatives charged lower fees by, among other things, removing the additional payments to ADP and/or Morgan Stanley.

5.     Plaintiff brings this action by and through their undersigned attorneys based upon their personal knowledge and information obtained through counsel's investigation. Plaintiff anticipates that discovery will uncover further substantial support for the allegations in this Complaint.

## II.   NATURE OF THE ACTION

6.      The ERISA fiduciary obligations of retirement plan fiduciaries to the participants and beneficiaries of a plan are "the highest known to the law." *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 333 (3d Cir. 2019).

7.      When selecting investments for a retirement plan, plan fiduciaries are required to: perform with undivided loyalty; act prudently; and defray reasonable plan expenses. ERISA §404(a)(1), 29 U.S.C. §1104(a)(1).

8.      Defendants, who during the Class Period are or were fiduciaries of the Plan, have violated their fiduciary duties owed to the Plan and its participants, including Plaintiff.

9.      Defendants, during the Class Period, were responsible for selecting, monitoring, and removing the investments in the Plan. Instead of acting for the exclusive benefit of the Plan and its participants and beneficiaries, and with the care, skill, prudence, and diligence required by ERISA, with respect to managing the Plan's assets, Defendants forced the Plan into investments that charged excessive fees that benefitted ADP and/or Morgan Stanley at the expense of the Plan.

10.     This class action is brought on behalf of participants in the Plan who participated from September 30, 2013 to the present (the "Class Period").

## III.   JURISDICTION AND VENUE

11.     **Subject Matter Jurisdiction.** This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because it is a civil action arising under the laws of the United States, and pursuant to ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

12.     **Personal Jurisdiction.** This court has personal jurisdiction over each of the Defendants because they reside and/or transact business in and have significant contacts

with this District, and because ERISA provides for nationwide service of process, ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), and the Plan is and was administered in this District and the breaches of ERISA took place herein. This Court also has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in Illinois.

13. **Venue.** Venue is proper in this District pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because the Plan is and was administered in Chicago, Illinois, within this District, the breaches of ERISA took place in this District, and/or a Defendant resides or may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391 because a defendant resides and/or does business in his District and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## IV.    PARTIES

14. Plaintiff, Carl Martin, is a current resident of Norcross, Georgia. He is a former employee of CareerBuilder, LLC., and, was at all relevant times, a "participant," in and beneficiary of the Plan as defined by ERISA § 3(7), 29 U.S.C. § 1002(7). Despite moving his personal 401(k) fund from the Plan in late 2017, he nevertheless remains a Plan participant under ERISA because he: (1) was a participant during the times of the alleged breaches of fiduciary duty; (2) may be eligible to receive benefits though the Plan; and (3) maintains a colorable claim for such benefits. He participated in the Plan from 2014 until late 2017.

16. Plaintiff, like substantially all Plan participants and beneficiaries, was not provided any information regarding the substance of deliberations, if any, of Defendants concerning the Plan's menu of investment options or selection of service providers during the

Class Period. Plaintiff otherwise had no knowledge of the substance of the deliberations, or of the nature of the investments offered in the Plan beyond what was provided to them by the Plan. Plaintiff discovered their claims shortly before commencing this action.

17.     Defendant, CareerBuilder, is a corporation organized and existing under the laws of Delaware which is registered to do business in Illinois. CareerBuilder is the "Plan Sponsor" within the meaning of 29 U.S.C. § 1002(16)(B). Under the Plan Documents, CareerBuilder is also a "named fiduciary" pursuant to 29 U.S.C. § 1102(a) because it is identified in the Plan Documents as having authority to control and manage the operation and administration of the Plan. CareerBuilder is an internet-based employment listing service which links those seeking employment with employers seeking to hire new employees. As of 2017, it had over 2,600 employees who participated in its 401(k) Plan with total assets in excess of 180 Million Dollars. Its principal place of business is 200 N. LaSalle Street, Suite 1100, Chicago, Illinois 60601. Its registered agent for service of process, as listed in the records of the Illinois Secretary of State's Office is Theresa Legler also having an address of 200 N. LaSalle Street, Suite 1100, Chicago, Illinois 60601.

18.     CareerBuilder is also the "Plan Administrator" under 29 U.S.C. § 1002(16)(A), controlling and managing the operation and administration of the Plan with authority to appoint and delegate discretionary authority to an advisory committee or individual.

19.     The current and former members of the Unknown 401(k) Plan Committee and any individual or entity to whom it delegated any of its fiduciary functions, the nature and extent of which have not been disclosed to Plaintiff, are also fiduciaries of the Plan under 29 U.S.C. § 1002(21) because they exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or

discretionary responsibility in the administration of the Plan. Because those entities and individuals are currently unknown to Plaintiff they are collectively named as Jane and John Does 1-20.

20.     The monitoring defendants are currently unknown to the Plaintiff. The monitoring defendants would have been responsible for appointing the Unknown 401(k) Plan Committee and overseeing its operations. It would have had the ability to remove and appoint new members of the Committee. It's individual member or members are identified as John and Jane Does 21-31. The entity or individuals identified in this Paragraph will be referred to hereinafter as the "Unknown Monitoring Defendants."

21.     There may be unknown fiduciaries to the Plan. The Unknown 401(k) Plan Committee, the Unknown Monitoring Defendants and/or CareerBuilder may have delegated their authority as a Fiduciary to the Plan to an unknown entity, entities and/or individual(s). The entity, entities and/or individual(s) identified in this Paragraph will be referred to hereinafter as the "Unknown Fiduciaries" and its individual members shall be referred to as Jane and John Does 32-42. All Defendants, except for the Unknown Monitoring Defendants, identified above shall be referred to collectively as the "Defendants."

22.     Defendants are, or during the Class Period were, fiduciaries to the Plan within the meaning of ERISA §§ 3(21)(A)(i) and (iii), 29 U.S.C. §§ 1002(21)(A)(i) and (iii), and parties in interest to the Plan within the meaning of ERISA §§ 3(14)(A) and (C), 29 U.S.C. §§ 1002(14)(A) and (C).

## V.    FACTS

### A.    The Plan and Administration of the Plan

23.     The Plan is an employee benefit plan within the meaning of ERISA §3(3), 29 U.S.C. §1002(3), which is subject to the provisions of Title I of ERISA pursuant to ERISA

§4(a), 29 U.S.C. §1003(a).

24.     The Plan is also an "employee pension benefit plan" or "pension plan" as defined by ERISA §3(2)(A), 29 U.S.C. §1002(2)(A), and "defined contribution plan" or "individual account plan" within the meaning of ERISA §3(34), 29 U.S.C. §1002(34).

25.     The Plan covers eligible employees of CareerBuilder.

26.     CareerBuilder is the Plan Sponsor. Upon information and belief, it delegated responsibility for selecting, monitoring, and removing the investment options in the Plan to the Unknown 401(k) Plan Committee.

27.     Participants in the Plan have the opportunity to direct the investment of the assets allocated to their individual accounts into the investment options approved by CareerBuilder and its Administrators and offered by the Plan, and the return on those investments are credited to each participant's account. Participants who do not direct the investment of the assets are invested in the Plan's default investment option.

28.     During the Class Period, the majority, if not all, of the investment options in the Plan paid and currently pay revenue sharing to ADP and/or Morgan Stanley.

29.     The Plan's benefits are funded by participants' voluntary tax-deferred and after-tax (Roth) contributions and by employer matching contributions.

30.     The Plan's most recent Form 5500 filing with the U.S. Department of Labor states that at the end of the 2017 plan year, the Plan had 2,685 total participants with account balances with a total amount of assets listed in excess of 180 Million Dollars.

31.     At all relevant periods, ADP and/or Morgan Stanley served, and continues to serve, as the Plan's Recordkeeper and/or Advisor.

32.     The Recordkeeper of a defined contribution plan, like the Plan, maintains participant account balances, provides a website and telephone number for Plan Participants

to monitor and control their Plan accounts, and provides various other services to the Plan.

33.     These services are highly commoditized, with little or nothing distinguishing the services provided by one recordkeeper over another.

34.     For providing various services, third-party plan administrators, record-keepers, consultants, investment managers, and other vendors in the 401(k) industries have developed a variety of pricing and fee structures.

35.     At best, these fee structures are complicated and confusing when disclosed to Plan participants. At worst, they are excessive, undisclosed, and illegal.

36.     The compensation ADP and/or Morgan Stanley received for its recordkeeping and/or advisory services to the Plan was excessive and unreasonable and the Defendants breached their fiduciary obligations under 29 U.S.C. §1104(a) to ensure that ADP and/or Morgan Stanley's compensation was no more than reasonable.

37.     The Defendants also failed to maintain a prudent process for evaluating the amount and reasonableness of this compensation. Instead of evaluating the cost of these services in the marketplace, the Defendants permitted ADP and/or Morgan Stanley to administer and do the recordkeeping for the Plan without meaningful market competition. At no time did Defendants limit or curtail ADP and/or Morgan Stanley's growing compensation — rather, ADP and/or Morgan Stanley was allowed to generate ever higher fees despite costs which were either stable or falling.

38.     Failing to do so constituted a breach of the duties of prudence in violation of 29 U.S.C. §1104(a) and cost the Plan millions of dollars in excessive fees charged directly by ADP and/or Morgan Stanley or collected by ADP and/or Morgan Stanley from the Plan's investment options through revenue sharing.

39.     Pursuant to 29 U.S.C. §1109, the Defendants are personally liable and are

liable to make good to the Plan any losses to the Plan resulting from this breach, as well as any other equitable or remedial relief the Court deems appropriate.

**B.    ADP and/or Morgan Stanley's Sources of Compensation**

40.    Defendants caused the Plan to purchase recordkeeping, administration, investment management, advisory services and other services from various institutions and entities. The fees paid to ADP and/or Morgan Stanley, are, and have been, unreasonable and excessive. In order to provide for this compensation to ADP and/or Morgan Stanley, Defendants have included inferior and imprudently selected investment options as core Plan investments.

41.    Defendants have caused the amounts that the Plan pays for these services to be assessed against Plan participants' accounts.

42.    Defendants have caused or allowed ADP and/or Morgan Stanley to receive payment in at least three ways:

(A)    By direct disbursement from the Plan to the entity providing the service;

(B)    By receiving, or having the opportunity to receive, "Revenue Sharing" payments comprised of Plan assets distributed between or among various service providers;

(C)    By profiting from the inclusion of funds which charged fees to all investors, including the Plan; and

**i.    "Hard Dollar" Payments to ADP and/or Morgan Stanley**

43.    Payments in the form of direct disbursements from the Plan to an entity providing a service to the Plan are characterized as "Hard Dollar" payments or "Direct

Compensation".

44.     Plan Sponsors, like CareerBuilder, generally disclose to government regulators, in one form or another, Hard Dollar payments made from the Plan to service providers.

45.     When such disclosures are made, understanding the Plan's service provider expenses for a given year *appears* straightforward: the Plan transfers funds in a stated amount to the provider in return for the provider's services. From this, Plan participants and government regulators surmise that the Plan expended the stated amount in exchange for the services.

46.     In this case, in 2017, for example, $24,026 is reported as hard dollar payments to ADP, LLC and $65,000 is reported as hard dollar payments to Morgan Stanley for a total of $89,026 in hard dollar payments. When this amount is divided by the number of total participants, being 2655, this leaves a deceptively and intentionally low per participant cost of $33 per participant. Similar results were seen beginning September 30, 2013 through 2016. As will be discussed below, the amount of revenue sharing must be taken into account when determining whether Recordkeeping and Advisory services are reasonable. When revenue sharing is added to this per participant amount, the amount paid for Recordkeeping and Advisory services is imprudent. These amounts will be discussed below.

ii.  **Excessive Recordkeeping and Advisory Fees Paid when Revenue Sharing Payments to ADP and/or Morgan Stanley and Possibly Others is Accounted for**

47.     While the hard dollar fees above appear modest or misstated, it must be the case that the vast majority of ADP and/or Morgan Stanley's and possibly others compensation came in the form of Revenue Sharing.

48.     Industry commentators and analysts consider Revenue Sharing as the "big secret of the retirement industry."

49.     Industry commentators and analysts generally define Revenue Sharing as the transfer of asset-based compensation from brokers or investment management providers (such as mutual funds, common collective trusts, insurance companies offering general insurance contracts, and similar pooled investment vehicles) to administrative service providers (record- keepers, administrators, advisors and trustees) in connection with 401(k) and other types of defined contribution plans.

50.     For example, a plan or its agent (a third-party administrator, consultant, or similar fiduciary) seeking to invest plan assets in an investment vehicle (a mutual fund, common and collective trust, guaranteed investment contract, etc. (collectively a "Fund")) will negotiate an agreement that sets the costs assessed against each dollar invested by specifying the expense ratio and available Revenue Sharing (which is included within the expense ratio).

51.     In Revenue Sharing arrangements, a plan and a Fund agree upon an asset-based fee (an expense ratio) that is not the true price for which the Fund will provide its service. Because the revenue sharing fees are intentionally or imprudently hidden by recordkeepers, advisors and/or trustees, many companies sponsoring a 401(k) plan for their employees are imprudently unaware and/or have failed to conduct a prudent investigation regarding the amount of revenue sharing occurring in their plan.

52.     Instead, the agreed asset-based fee includes ***both*** the actual price for which the Fund will provide its service ***and*** additional amounts that the Fund does not need to cover the cost of its services and to make a profit.

53.     The additional portion of the agreed-upon asset-based charge is "shared"

with plan service providers or others who do business with the plan or the Fund.

54.     As a result of Revenue Sharing arrangements, plan service providers or others who do business with the plan or the Fund can receive *both* Hard Dollar payments from the plan *and* additional revenue that the Fund "shares" with them.

55.     The total fees a Fund charges to a plan can vary widely based upon a number of factors, including without limitation: the amount that the plan invests in the Fund; the level of sophistication of the plan fiduciary negotiating the fee agreement; the plan fiduciary's awareness of Revenue Sharing and effort to monitor revenue sharing transfers; the diligence with which the plan fiduciary conducts such negotiations; and the separate financial interests and/or agendas of the plan fiduciary and the Fund as they negotiate.

56.     To severely reduce, or eliminate Hard Dollar payments altogether, a plan's fiduciaries and/or a service provider like ADP and/or Morgan Stanley may choose funds and share classes at a level high enough: (A) to cover the Fund's services and profit; and (B) to provide excess Revenue Sharing more than sufficient to cover at least all other Plan services. This causes a plan's recordkeeping fees to appear deceptively low in disclosures to Plan participants and government regulators.

57.     When Plan service providers receive compensation in the form of both Hard Dollar fees *and* Revenue Sharing payments determining the total amount of fees and expenses that the Plan incurs for any category of services (*i.e.* recordkeeping and administration, investment advisory, trustee, auditing, etc.) requires that *both* the Hard Dollar fees *and* Revenue Sharing payments be taken into account.

58.     Although Revenue Sharing monies arise only as a result of, and in connection with, transactions involving the Plan, plan assets, and service providers, Revenue Sharing is not always captured and used for the benefit of the Plan and the

participants.

59.     In addition, Plan fiduciaries may limit their selection of funds to only those funds which provide sufficient revenue sharing, thus foregoing superior investment alternatives and selecting or maintaining inferior investment options based upon revenue sharing relationships. These alternatives include different share classes of the identical mutual fund that charged lower fees because they do not pay revenue sharing, institutional products by the same fund managers which offer materially identical services for even lower cost, or superior alternatives offered by different managers who do not pay revenue sharing to the Plan recordkeeper and/or advisors.

60.     Plan fiduciaries may do this to conceal the true amount of compensation paid to the recordkeeper or to reduce the plan sponsor's cost at the expense of plan participants.

61.     Nearly all of the actively managed mutual funds included in the Plan must have paid revenue sharing to ADP and/or Morgan Stanley and possibly others.

62.     ADP and/or Morgan Stanley routinely pay revenue sharing to other vendors who place investments in its funds, and, upon information and belief, attributes revenue sharing payments to its recordkeeping division when, as here, ADP and/or Morgan Stanley is the Plan recordkeeper, advisor and/or trustee.

63.     In determining whether a Plan Administrator or other fiduciary has fulfilled its obligation to ensure that the fees and expenses assessed against the Plan are reasonable and incurred solely in the interest of Plan participants, all sources of compensation, including revenue sharing, must also be taken into account.

64.     To determine a prudent amount for recordkeeping and advisory services, the total amount of revenue sharing to ADP and/or Morgan Stanley must be added to the hard dollar amounts discussed above. In 2017 for example, ADP Broker Dealer, LLC reported in

section of their 2017 5500s that it received $311,798 in indirect payments and when this is added to the hard dollar payments of $89,026 to Morgan Stanley and ADP, LLC the total amount for advisory and recordkeeping services in 2017 was $400,824 which translates into a $150.97 per participant fee. This fee was $136.39 in 2016, $131.39 in 2015, $222.43 in 2014, $210.02 in 2013.

65.     The per participant amounts listed in the paragraph above are not easily determined by a layperson. To determine these per participant fees, expertise with the retirement industry is needed to work through the appropriate sections of the Plan's public filings and documents distributed to Plan participants.

66.     In addition, further per participant costs may be uncovered in discovery. Advisory and Recordkeeping services are typically outsourced to one or more third-party service providers who, as discussed above, may be paid directly by employers, directly by the plan, or indirectly by the investments within the plan, often in the form of 12b-1 and/or sub-TA fees. The latter practice is known as "revenue sharing."

67.     The practice of revenue sharing means that the administrative costs for running the plan are ultimately paid out of the investment management fees, as income from fees collected by the advisors of investment funds on the plan menu are passed back to the service provider as compensation for certain services (e.g., as 12b-1 fees and/or sub-TA fees). Higher-cost share classes often make revenue sharing payments to cover administrative costs.

68.     The Department of Labor requires plans to identify which of their service providers are being paid via revenue sharing, a practice referred to as "indirect compensation" on the Form 5500. One reason for this required disclosure is that revenue sharing can create a conflict of interest in the construction of the plan menu. Employers

select investment options for the plan with the guidance of service providers who, in many cases, receive revenue from funds that are included in the plan (through revenue sharing). The conflict of interest emerges when the service provider stands to receive greater compensation by selecting certain funds.

69.    However, service providers can hide the revenue flowing to them from the mutual funds they select for a given plan by developing so-called "bundled" service sets. The problem with "bundled" service arrangements is that it is extremely difficult to locate hidden revenue sharing fees and calculate the service provider's total compensation: often the "bundled" service provider (*e.g.*, a recordkeeper) will receive direct payments for its recordkeeping as well as indirect payments from the plans investments, but it will not disclose to plan fiduciaries these hidden indirect payments between itself and the investment fund which holds the assets. Such revenue sharing is occurring and must have occurred in the Plan and must be added to the total per participant amount where applicable.

70.    An acceptable fee for these recordkeeping, advisory and management services should be no more than $40 per participant. Had the Defendants been acting as prudent fiduciaries, these amounts would have been questioned as early as September 30, 2013 and adjusted accordingly. The failure to make this adjustment in 2013 continued to impact the Plan and the continuing decision to pay these fees every 3 months thereafter continued to impact the Plan into 2014 to the present.

71.    It is estimated that the Plan overpaid for administrative and advisory services by at least 1.1 Million Dollars from September 30, 2013 to 2017. These amounts would increase if the money had been invested in the Plan. In addition, it is expected that a review of data from 2018 and forward, after discovery, will show additional excessive amounts paid for administrative and advisory services during these years until the present.

72.     It is alleged and, therefore, averred, that the Defendants intentionally or imprudently kept the Plan in this excessive recordkeeping and administrative fee arrangement to continue to retain the services of ADP and/or Morgan Stanley and possibly others so that the Defendants would not incur any additional cost in administering the Plan. ADP and/or Morgan Stanley may have required or strongly suggested as part of their program that the Defendants retain the Recordkeeping and Administration services offered as part of their package. ADP and/or Morgan Stanley offers an arrangement whereby much of the cost of administering a 401(k) Plan is absorbed by ADP and/or Morgan Stanley through revenue sharing. Revenue sharing is not in and of itself a breach of a fiduciary duty, but, excessive revenue sharing is. Defendants should have set a limit to the amount of revenue sharing ADP and/or Morgan Stanley, and, possibly others, were permitted to make. The Defendants should have negotiated this in good faith as fiduciaries to the Plan and required that ADP and/or Morgan Stanley, and possibly others, put any revenue sharing over a reasonable limit back into the Plan. As part of this negotiation, the amount of recordkeeping and administrative fees should have been limited to a reasonable amount and as plan assets continued to grow, this amount should have been monitored to ensure that any resulting increase in asset-based compensation was no more than reasonable.

73.     One way a fiduciary can determine the reasonableness of the plan's total administrative expenses and investment management fees is by comparison to other similarly-sized plans. Publicly available surveys provide important information to help fiduciaries understand the quality of their plan design and structure. For example, the Department of Labor makes available a comprehensive database for the universe of 401(k) plans (the "DOL Form 5500 Research File"), which plan fiduciaries can analyze. The BrightScope Defined Contribution Plan Database contains additional industrywide fee

information based on audited filings that supplement the DOL Form 5500 Research File. Clearly, this was not done in this case.

### C. Defendants' Imprudent Selection and Retention of Options Paying Excessive Fees to ADP and/or Morgan Stanley, and, possibly others, when Identical Lower Cost Alternatives were Available

74.     In order to facilitate revenue sharing Defendants maintained investment options despite no expectation they would outperform cheaper or superior alternatives. While Plaintiff lacks knowledge of Defendants' fiduciary selection process, a long series of decisions involving the Plan's investments indicate a failure by Defendants to prudently select and monitor the investment options in the Plan. For example:

### i.  Identical Alternatives with Lower-Cost and, Better Prospects for Future Performance were Available for the Plan

75.     Sizeable retirement plans, like the Plan, have substantial bargaining power to negotiate low fees for investment management services.

> The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the 'prevailing circumstances'—such as the size of the plan—are a part of a prudent decision-making process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.

Fred Reish, *Just Out of Reish: Classifying Mutual Funds*, Plan Sponsor Magazine (Jan. 2011).

76.     Lower-cost institutional share classes of the same funds are available to institutional investors, like the Plan, that meet the minimum investment amounts for these

share classes. In addition, large retirement plans can invest in collective investment trusts or hire asset managers directly to manage separate accounts for the plan within plan-specific investment parameters and with even lower investment management fees.

77.     Despite these identical lower-cost options, Defendants have invested, and continue to invest, Plan assets in mutual funds with a higher cost than identical mutual funds that were and are available for the Plan.

78.     For the *exact same mutual fund option*, the Plan has offered higher-cost share classes of *identical* mutual funds than were available to the Plan, without prudently considering these lower-cost identical alternatives or recapturing the excessive fees for the benefit of the Plan.

79.      The lower-cost identical funds to the Plan's investments include and have included more than 40% of all the mutual funds selected and maintained in the Plan by Defendants. The appropriate Plan funds which were in the Plan in 2017 are compared to the lower-cost identical funds available in the spreadsheet below:

| Name | Net Expense Ratio | Less Expensive Share Class | Less Expensive Share Cost | Excess Cost |
|---|---|---|---|---|
| JTSSX $ 14,394,324 JPMorgan SmartRetirement 2050 Fund Class I | 0.71 % | JTSYX JPMorgan SmartRetirement 2050 Fund Class R6 | 0.49 % | 45% |
| JSASX $ 12,030,820 JPMorgan SmartRetirement 2045 Fund Class I | 0.72 % | JSAYX JPMorgan SmartRetirement 2045 Fund Class R6 | 0.50 % | 44% |
| SMTSX $ 7,359,183 JPMorgan SmartRetirement 2040 Fund Class I | 0.71 % | SMTYX JPMorgan SmartRetirement 2040 Fund Class R6 | 0.49 % | 45% |
| JFFSX $ 6,813,102 JPMorgan SmartRetirement 2055 Fund Class I | 0.71 % | JFFYX JPMorgan SmartRetirement 2055 Fund Class R6 | 0.49 % | 45% |

| Name | Net Expense Ratio | Less Expensive Share Class | Less Expensive Share Cost | Excess Cost |
|---|---|---|---|---|
| SRJSX $ 3,216,652 JPMorgan SmartRetirement 2035 Fund Class I | 0.70 % | SRJYX JPMorgan SmartRetirement 2035 Fund Class R6 | 0.48 % | 46% |
| JSMSX $ 1,472,384 JPMorgan SmartRetirement 2030 Fund Class I | 0.70 % | JSMYX JPMorgan SmartRetirement 2030 Fund Class R6 | 0.48 % | 46% |
| JNSSX $ 829,422 JPMorgan SmartRetirement 2025 Fund Class I | 0.69 % | JNSYX JPMorgan SmartRetirement 2025 Fund Class R6 | 0.47 % | 47% |
| JTTSX $ 388,747 JPMorgan SmartRetirement 2020 Fund Class I | 0.66 % | JTTYX JPMorgan SmartRetirement 2020 Fund Class R6 | 0.45 % | 47% |
| PSCZX $3,168,286 PGIM Jennison Small Company | 0.81 % | PJSQX PGIM Jennison Small Company R6 | 0.68 % | 19% |
| MGRFX $ 19,394,446 MassMutual Select Mid Cap Growth Fund Class R5 | 0.82 % | MEFZX MassMutual Select Mid Cap Growth Fund Class I | 0.72 % | 14% |
| FCNTX $ 16,306,298 Fidelity Contrafund Fund | 0.74 % | FCNKX Fidelity Contrafund Fund Class K | 0.65 % | 14% |

80.     As shown in the table above, nearly 80% of the investments listed paid fees that were well over 40% higher than they should have paid for the *identical* product. In addition, it is expected, once complete data is available, the numbers will show that revenue sharing on these funds were between 18% to over 30%. Revenue sharing at this level, shows a lack of any prudent process for monitoring these funds. Clearly, had there been a prudent monitoring process in place, the majority of these funds would have been replaced with less expensive alternatives as early as September 30, 2013. Complete data is currently unavailable for 2018 but it is expected that once this data is obtained through discovery similar results will be seen for 2018 and forward. The failure to monitor and replace these

funds as early as September 30, 2013 is an ongoing breach of the Defendants' fiduciary duties and the impacts of that breach continued to effect subsequent years going into 2013 and subsequent years until the present. A prudent fiduciary would have conducted a review of all the funds in the Plan each quarter and should have made adjustments as necessary. Clearly such a prudent review didn't occur in this case and this failure compounded as the years moved forward.

81.     A review of the funds listed above suggest that there were no minimum investment amounts required to purchase the lower cost alternative for a group 401(k) like the Plan. It is expected that discovery will reveal that the vast majority, if not all, of the funds in the Plan could have easily qualified for the lower cost alternatives listed above during the Class Period.

82.     By way of example, since September 30, 2013 until December 31, 2017, the Plan invested in Fidelity Contra FCNTX. In 2017, the amount invested in that fund exceeded $16,306,298. As detailed in the chart above, an identical product was available, Fidelity Contra Class K, FCNKX. It's believed there was no minimum investment amount required for the purchase of the Class K shares. Had the Defendants chosen to use this identical product, they would have saved the plan an estimated 14% percent a year on expenses. In 2017, this amount would have been more than an estimated $14,000. Had that identical alterative fund been chosen in September 30, 2013, the Plan Participants savings would have compounded over the years. In addition, using a conservative estimate, those savings would have earned close to 7% per year saving an estimated amount on this fund alone of over $100,000. This is only one example from all the examples listed above.

83.     These funds have identical managers, holdings, and strategies. The only difference is the share class which, in this case, means the only difference is the amount of

revenue sharing. The failure to utilize these identical investment options has cost the Plan approximately $1.1 Million from September 30, 2013 to 2017. It is expected these losses continue in to the present. In addition, had the Plan invested in the identical lower cost alternatives the savings left in the Plan from September 30, 2013 to present would only have increased for the Plan participants.

84.     The failure to select lower-cost identical funds for the Plan's mutual funds which are identical in all respects (portfolio manager, underlying investments, structure, and asset allocation) except for cost demonstrates that either Defendants intentionally refused to move the Plan to a cheaper share class, or that it failed to consider the size and purchasing power of the Plan when selecting share classes and engaged in no prudent process in the selection, monitoring, and retention of those mutual funds. Either explanation constitutes a violation of Defendants' fiduciary obligations to the Plan. *Tibble v. Edison Int'l*, 843 F. 3d 1187, 1198 (9th Cir. 2016) ("[A] trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical — other than their lower cost — to products the trustee has already selected.").

85.     It is alleged and, therefore, averred, that the Defendants intentionally or imprudently kept the Plan in this revenue sharing arrangement so that the Defendants would not incur any additional cost in administering the Plan. Revenue sharing is not in and of itself a breach of their fiduciary duty, but, excessive revenue sharing is. Defendants should have set a limit to the amount of revenue sharing ADP and/or Morgan Stanley, and, possibly others, were permitted to make. The Defendants should have negotiated this in good faith as fiduciaries of the Plan and required that ADP and/or Morgan Stanley, and possibly others, put any revenue sharing over a reasonable limit back into the Plan.

86.     One way a fiduciary can determine the reasonableness of the plan's total

amount of revenue sharing is by comparison to other similarly-sized plans. Publicly available surveys provide important information to help fiduciaries understand the quality of their plan design and structure. For example, the Department of Labor makes available a comprehensive database for the universe of 401(k) plans (the "DOL Form 5500 Research File"), which plan fiduciaries can analyze. The BrightScope Defined Contribution Plan Database contains additional industrywide fee information based on audited filings that supplement the DOL Form 5500 Research File. Clearly, this was not done in this case.

87.     Had the amounts invested in the higher cost and share class mutual fund options instead been invested in lower-cost identical mutual fund options from September 30, 2013 to December 31, 2017, Plan participants would have retained an amount estimated to be in excess of $1.3 Million in their retirement savings, which would have grown even larger because it would have remained invested in the Plan. Once the appropriate data is obtained through discovery, including, but not limited to, data from 2018, these amounts will be calculated to a mathematical certainty.

**ii.  Selection of, and failure to remove, excessively expensive and poor performing funds**

88.     Defendants systematically maintained the mutual funds in the Plan, listed below, despite high fees, and in some cases lower performance, in order to provide or without apparent concern that doing so provided excessive revenue sharing to ADP and/or Morgan Stanley. As fiduciaries, Defendants, in particular, the Unknown 401(k) Plan Committee, were required to engage in a prudent process for monitoring these funds and the fact that the funds chosen remained in the Plan despite their high cost suggests that the Defendants failed to engage in any prudent process whatsoever or one that was severely and deficient. As discussed below, these failures were likely intentional, but, if not, imprudent.

| Current Fund | Current Fund Expense | Type | Alt Fund | Alt ER | ICI Median |
|---|---|---|---|---|---|
| JPMorgan SmartRetirement 2025 Fund Class I | 0.69 % | Target Date | Fidelity Freedom Index 2025 Investor | 0.12% | 0.55% |
| JPMorgan SmartRetirement 2020 Fund Class I | 0.66 % | Target Date | Fidelity Freedom Index 2020 Investor | 0.12% | 0.55% |
| JPMorgan SmartRetirement 2030 Fund Class I | 0.70 % | Target Date | Fidelity Freedom Index 2030 Investor | 0.12% | 0.55% |
| JPMorgan SmartRetirement 2035 Fund Class I | 0.70 % | Target Date | Fidelity Freedom Index 2035 Investor | 0.12% | 0.55% |
| JPMorgan SmartRetirement 2060 Fund Class I | 0.71 % | Target Date | Fidelity Freedom Index 2060 Investor | 0.12% | 0.55% |
| JPMorgan SmartRetirement 2040 Fund Class I | 0.71 % | Target Date | Fidelity Freedom Index 2040 Investor | 0.12% | 0.55% |
| JPMorgan SmartRetirement 2045 Fund Class I | 0.72 % | Target Date | Fidelity Freedom Index 2045 Investor | 0.12% | 0.55% |
| JPMorgan SmartRetirement Income Fund Class I | 0.61 % | Target Date | Fidelity Freedom Index Income Investor | 0.12% | 0.55% |
| JPMorgan SmartRetirement 2050 Fund Class I | 0.71 % | Target Date | Fidelity Freedom Index 2050 Investor | 0.12% | 0.55% |
| JPMorgan SmartRetirement 2055 Fund Class I | 0.71 % | Target Date | Fidelity Freedom Index 2055 Investor | 0.12% | 0.55% |
| Victory Sycamore Established Value Fund Class R6 | 0.57 % | Domestic Equity | Vanguard 500 Index Fund Admiral Shares | 0.04% | 0.52% |
| BlackRock Equity Dividend Fund Institutional Shares | 0.73 % | Domestic Equity | Vanguard 500 Index Fund Admiral Shares | 0.04% | 0.52% |
| Vanguard Institutional Index Fund Institutional Shares | 0.04 % | Domestic Equity | Vanguard Institutional Index Fund Institutional Shares | 0.04% | 0.11% |
| MassMutual Select Mid Cap Growth Fund Class R5 | 0.82 % | Domestic Equity | Vanguard Mid-cap Growth Index Admiral Shares | 0.07% | 0.52% |
| Fidelity Contrafund Fund | 0.74 % | Domestic Equity | Vanguard 500 Index Fund Admiral Shares | 0.04% | 0.52% |

| Current Fund | Current Fund Expense | Type | Alt Fund | Alt ER | ICI Median |
|---|---|---|---|---|---|
| Harbor International Fund Institutional Class | 0.72 % | Int'l Equity | Vanguard Total International Stock Index Fund Admiral Shares | 0.11% | 0.68% |
| JPMorgan SmartRetirement 2060 Fund Class I | 0.71% | Target Date | Fidelity Freedom Index 2060 Instl Prem | 0.08% | 0.55% |
| Metropolitan West Total Return Bond Fund Class I | 0.45 % | Domestic Bond | Vanguard Intermediate-Term Corporate Bond Index Fund Admiral Shares | 0.07% | 0.40% |
| PGIM Jennison Small Company Fund- Class Z | 0.81 % | Domestic Equity | Vanguard Small-Cap Index Fund Admiral Shares | 0.05% | 0.52% |
| Nuveen Real Estate Securities Fund Class I | 1.04 % | Domestic Equity | Vanguard Real Estate Index Fund Admiral Shares | 0.12% | 0.52% |
| Franklin Small Cap Value Fund Class R6 | 0.61 % | Domestic Equity | Vanguard Small-Cap Value Index Admiral Shares | 0.07% | 0.52% |
| Invesco Developing Markets Fund R5 Class | 1.06 % | Int'l Equity | Vanguard Emerging Markets Stock Index Fund Admiral Shares | 0.14% | 0.68% |
| Dreyfus Natural Resources Fund Class I | 1.05 % | Domestic Equity | Vanguard Materials Index Fund Admiral Shares | 0.10% | 0.52% |

89.     Nearly all of the mutual funds offered by the Plan between September 30, 2013 and 2017 have definite lower cost alternatives. Not surprisingly, approximately 9 of these funds or approximately 40 percent of them have remained in the Plan for five consecutive years without any change. Based on a review of the data available from September 30, 2013 and 2017, it is expected similar results will be seen for 2018 and forward once the data is available.

90.     Funds offering to pay ADP and/or Morgan Stanley revenue sharing were also added, and continued to be included, in the Plan despite higher fees, and in some cases

lower performance, compared to index funds or other investments that would not pay such fees to ADP and/or Morgan Stanley.

91.     Collectively, the Plan's actively managed investments were clearly more expensive each and every year of the Class Period, yet the Plan continues to offer these funds, primarily, because of the revenue sharing and other profits they provided to ADP and/or Morgan Stanley.

92.     Had the amounts invested in the higher-cost fund options instead been invested in the lower-cost alternatives from September 30, 2013 to December 31, 2017, Plan participants would have retained an amount estimated to be in excess of $9,000,000 in their retirement savings, which would have grown even larger because it would have remained invested in the Plan. Once the appropriate data is obtained through discovery, including, but not limited to, data from 2018 and forward, these amounts will be calculated to a mathematical certainty. The damages are not speculative.

93.     Thus, predictably, from September 30, 2013 to the present, the Plan would have been better off with index investments.

94.     In cases where the funds selected underperformed their peers, the Defendants' inability to select actively managed funds that outperform the index is consistent with the vast weight of evidence that actively managed funds rarely outperform their indexes over any extended period of time and fund pickers cannot reliably determine which mangers are likely to outperform in the future. Plaintiff does not believe Defendants should have been expected to "beat the market;" rather, that in accordance with their fiduciary duties, Defendants should have systematically reviewed the Plan investment options to ensure they were prudent given their performance and cost.

95.     Academic and financial industry literature shows the importance of low fees in

selecting investments. Numerous scholars have demonstrated that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2009); see also Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010) ("the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

96.     If an individual high-cost fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. FIN. 57, 57, 59 (1997)(measuring thirty- one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst- performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

97.     To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Eugene F. Fama &

Kenneth R. French, *Luck Versus Skill in the Cross- Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1931–34 (2010); Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J.FIN. 1655, 1690 (2000).

98.     Nobel Laureate William Sharpe also reached the same conclusion that active managers underperform passive managers net of fees. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 Fin. Analysts J. 7, 8 (January/February 1991).

99.     The Plan's experience backs this up, with Defendants consistently failing to select managers who outperform investible alternatives.

100.   Prudent fiduciaries of large defined contribution plans conduct an analysis to determine whether actively managed funds are expected to outperform their benchmark net of fees. Prudent fiduciaries then make a reasoned decision as to whether it would be in the participants' best interest to offer an actively managed option for the particular investment style and asset class.

101.   In addition, as discussed above, approximately 9 of these funds or approximately 40% percent of them have remained in the Plan for five consecutive years without any change. This shows a lack of any prudent process for monitoring these funds. Clearly, had there been a prudent process in place, the majority of these funds would have been replaced with less expensive alternatives as early as September 30, 2013. Since these funds were identical from September 30, 2013 to 2017 it is expected they were also in place in 2018 and forward. Complete data is currently unavailable for 2018. The failure to replace these funds as early as September 30, 2013 is an ongoing breach of the Defendants fiduciary

duties and the impacts of that breach continued to effect subsequent years going into 2014 and subsequent years until present when the funds were removed. A prudent fiduciary would have conducted a review of all the funds in the Plan each quarter and should have made adjustments as necessary, clearly such a prudent review didn't occur in this case and this failure compounded as the years moved forward.

102.    Again, it is alleged and, therefore, averred, that the Defendants intentionally or imprudently kept the Plan in this revenue sharing arrangement so that the Defendants would not incur any additional cost in administering the Plan. Revenue sharing is not in and of itself a breach of their fiduciary duty, but, excessive revenue sharing is. Defendants should have set a limit to the amount of revenue sharing ADP and/or Morgan Stanley, and, possibly others, were permitted to make. The Defendants should have negotiated this in good faith as fiduciaries of the Plan and required that ADP and/or Morgan Stanley, and possibly others, put any revenue sharing over a reasonable limit back into the Plan.

103.    One way a fiduciary can determine the reasonableness of the plan's total amount of revenue sharing is by comparison to other similarly-sized plans. Publicly available surveys provide important information to help fiduciaries understand the quality of their plan design and structure. For example, the Department of Labor makes available a comprehensive database for the universe of 401(k) plans (the "DOL Form 5500 Research File"), which plan fiduciaries can analyze. The BrightScope Defined Contribution Plan Database contains additional industrywide fee information based on audited filings that supplement the DOL Form 5500 Research File. Clearly, this was not done in this case.

104.    Against this evidence and Defendants' own experience of failing to identify actively managed funds likely to outperform, the most plausible explanation for the active fund's inclusion in the Plan was to facilitate excessive revenue sharing payments and

investment management fees to ADP and/or Morgan Stanley in a way that would not alert the Plan participants to these payments.

## IV. ERISA'S FIDUCIARY STANDARDS

105.     ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan. ERISA § 404(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and —
>
> (A)     for the exclusive purpose of:
>
> > (i)     providing benefits to participants and their beneficiaries; and
> >
> > (ii)     defraying reasonable expenses of administering the plan; [and]
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;
>
> (C)     by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so[.]

106.     ERISA also imposes co-fiduciary duties on plan fiduciaries. ERISA § 405, 29 U.S.C. § 1105, states in relevant part that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2)     if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a

fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

107.     Under ERISA, fiduciaries who exercise discretionary authority or control over the selection of plan investments and the selection of plan service providers must act prudently and solely in the interest of participants and beneficiaries of the plan when performing such functions. Thus, "the duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996).

108.     As the Department of Labor explains,

[T]o act prudently, a plan fiduciary must consider, among other factors, the availability, riskiness, and potential return of alternative investments for his or her plan. [Where an investment], if implemented, causes the Plan to forego other investment opportunities, such investments would not be prudent if they provided a plan with less return, in comparison to risk, than comparable investments available to the plan, or if they involved a greater risk to the security of plan assets than other investments offering a similar return.

DOL Opinion 88-16A (1988).

109.     Pursuant to these duties, fiduciaries must ensure that the services provided to the plan are necessary and that the fees are reasonable:

Under section 404(a)(1) of ERISA, the responsible Plan fiduciaries must act prudently and solely in the interest of the Plan participants and beneficiaries … in determining which investment options to utilize or make available to Plan participants or beneficiaries. In this regard, the responsible Plan fiduciaries must assure that the compensation paid directly or indirectly by the Plan to [service providers] is reasonable.

DOL Opinion 97-15A (1997); DOL Opinion 97-16A (1997).

110.     A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest

of plan participants and beneficiaries. As the Department of Labor has warned:

> [T]he Department has construed the requirements that a
> fiduciary act solely in the interest of, and for the exclusive
> purpose of providing benefits to participants and beneficiaries,
> as prohibiting a fiduciary from subordinating the interests of
> participants and beneficiaries in their retirement income to
> unrelated objectives. In other words, in deciding whether and to
> what extent to invest in a particular investment, or to make a
> particular fund available as a designated investment alternative, a
> fiduciary must ordinarily consider only factors relating to the
> interests of plan participants and beneficiaries in their retirement
> income. A decision to make an investment, or to designate an
> investment alternative, may not be influenced by non-economic
> factors unless the investment ultimately chosen for the plan, when
> judged solely on the basis of its economic value, would be equal
> to or superior to alternative available investments.

DOL Opinion 98-04A (1998); *see also* DOL Opinion 88-16A (1988). The Department of

Labor has repeatedly warned:

> While the law does not specify a permissible level of fees,
> it does require that fees charged to a plan be "reasonable." After
> careful evaluation during the initial selection, the plan's fees and
> expenses should be monitored to determine whether they
> continue to be reasonable.

*Meeting Your Fiduciary Responsibilities*, U.S. Dep't of Labor Employee Benefits

Security Admin. (Feb. 2012),

http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html.

111.  In a separate publication, the Department of Labor writes:

> The Federal law governing private-sector retirement plans,
> the Employee Retirement Income Security Act (ERISA),
> requires that those responsible for managing retirement plans --
> referred to as fiduciaries -- carry out their responsibilities
> prudently and solely in the interest of the plan's participants and
> beneficiaries. Among other duties, fiduciaries have a
> responsibility to ensure that the services provided to their plan
> are necessary and that the cost of those services is reasonable.

* * *

Plan fees and expenses are important considerations for all types of retirement plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.

* * *

By far the largest component of plan fees and expenses is associated with managing plan investments. Fees for investment management and other related services generally are assessed as a percentage of assets invested. Employers should pay attention to these fees. They are paid in the form of an indirect charge against the participant's account or the plan because they are deducted directly from investment returns. Net total return is the return after these fees have been deducted. For this reason, these fees, which are not specifically identified on statements of investments, may not be immediately apparent to employers.

*Understanding Retirement Plan Fees and Expenses*, U.S. Dep't of Labor Employee

Benefits Security Admin. (Dec. 2011),

http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html.

112.    ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), provides a cause of action against

a party in interest, such as CareerBuilder, for participating in a breach of a fiduciary duty by

an ERISA plan fiduciary.

113.    ERISA § 405(a), 29 U.S.C. §1105(a), provides a cause of action against a

fiduciary, such as CareerBuilder, for knowingly participating in a breach by another

fiduciary and knowingly failing to cure any breach of duty.

114.    ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is

a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations,

or duties imposed on fiduciaries by Title I ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA § 409, 29 U.S.C.§ 1109, further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate.

## V.  CLASS ACTION ALLEGATIONS

115.  ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan fiduciary, participant, beneficiary, or the Secretary of Labor to bring a suit individually on behalf of the Plan to recover for the Plan the remedies provided under ERISA § 409, 29 U.S.C. § 1109(a).

116.  In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiff seek to certify this action as a class action on behalf of:

> All participants in the Plan from September 30, 2013 to the present.
>
> Excluded from the class are Defendants, Defendants' beneficiaries,
>
> and Defendants' immediate families.

117.  Class certification is appropriate under Fed. R. Civ. P. 23(a) and (b)(1), (b)(2), and/or (b)(3).

(A)  The class satisfies the numerosity requirement of Rule 23(a) because it is composed of over 800 persons, in numerous locations. The number of class members is so large that joinder of all its members is impracticable.

(B)  The class satisfies the commonality requirement of Rule 23(a) because there are questions of law and fact common to the Class and these

questions have common answers. Common legal and factual questions include, but are not limited to: (a) who are the fiduciaries liable for the remedies provided by ERISA § 409(a), 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by causing the Plan to invest in excessively expensive funds and by failing to prudently remove the funds from the Plan; whether the decision to include and not to remove a fund was made solely in the interests of Plan participants and beneficiaries; what are the losses to the Plan resulting from each breach of fiduciary duty; and what are the profits of any breaching fiduciary that were made through the use of Plan assets by the fiduciary.

(C)     The class satisfies the typicality requirement of Rule 23(a) because Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff's claims, and the claims of all Class members, arise out of the same conduct, policies and practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct. Plaintiff was an investor in the Plan for the majority of the Class Period.

(D)     The class satisfies the adequacy requirement of Rule 23(a). Plaintiff will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

(E)     Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class

would create a risk of establishing incompatible standards of conduct for Defendants. Class action status also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

(F)     In the alternative, certification under Rule 23(b)(2) is warranted because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

(G)     In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VI.   CLAIMS FOR RELIEF

### A.   Count I - Imprudent Conduct in Connection with Investments Against the Company and Unknown 401(k) Plan Committee Defendants

118.     Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

119.     The Company and Unknown 401(k) Plan Committee are responsible for selecting, monitoring, and removing investment options in the Plan.

120.     These Defendants caused the Plan to invest millions of dollars in imprudent

investment options, many of which were more expensive than prudent alternatives, unlikely to outperform their benchmarks, and laden with excessive fees which facilitated revenue-sharing payments back to ADP and/or Morgan Stanley.

121.    These Defendants failed to remove the funds even though a prudent fiduciary would have done so given the high fees, poor performance prospects, and availability of lower-cost alternatives.

122.    By the conduct and omissions described above, these Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

123.    The Company and Unknown 401(k) Plan Committee failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

124.    As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants have paid, directly and indirectly, substantial excess investment management and other fund-related fees during the Class Period, and suffered lost-opportunity costs which continue to accrue, for which Defendants are jointly and severally liable pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

    **B.    Count II - Imprudent Conduct in Connection with Recordkeeping Fees and Total Plan Costs Against the Company and Unknown 401(k) Plan Committee**

**Defendants**

125. Plaintiff repeats and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

126. The Company and Unknown 401(k) Plan Committee are responsible for selecting, monitoring, negotiating with and removing the Plan's Recordkeeper.

127. These Defendants caused the Plan to pay, directly or indirectly, millions of dollars to ADP and/or Morgan Stanley during the Class Period. ADP and/or Morgan Stanley's compensation, and the Total Plan Costs, were excessive and unreasonable given the services provided.

128. These Defendants failed to monitor and control these costs despite lower-cost Recordkeeping alternatives.

129. By the conduct and omissions described above, The Company and Unknown 401(k) Plan Committee failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

130. These Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

131. As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants have paid, directly and indirectly, substantial excess fees during the Class Period, and suffered lost-opportunity costs which continue to accrue, for which

Defendants are jointly and severally liable pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

**C.    Count III -- Failure to Adequately Monitor Other Fiduciaries Against the Unknown Monitoring Defendants**

132.   Plaintiff repeats and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

133.   Upon information and belief, members of the Unknown 401(k) Plan Committee were appointed by the Unknown Monitoring Defendants. It is currently unknown which entity or individuals appointed the Unknown 401(k) Plan Committee.

134. At all relevant times, the Unknown Monitoring Defendants were a fiduciaries of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

135.   Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not.

136. The Monitoring Defendants named in this Count breached their fiduciary monitoring duties by, among other things, (a) failing to monitor and evaluate the performance of the Plan's fiduciaries or have a system in place for doing so, standing idly by as the Plan suffered significant losses, due to the unduly excessive fees, as a result of the Plan fiduciaries' imprudent actions; (b) failing to monitor and evaluate the costs of the investment options offered by the Plan, such that the Plan lost millions of dollars due to excessive fees; (c) failing to monitor the processes and policies by which the Plan's investments were evaluated, and (d) failing to remove fiduciaries whose performance was

inadequate in that they continued to maintain imprudent and excessively costly investments within the Plan, to the detriment of the Plan and Plan participants' retirement savings.

137.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

138.   Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## VII.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief as follows:

A.      A declaration that the Defendants breached their fiduciary duties under ERISA § 404;

B.      An order compelling the Defendants to restore all losses to the Plan arising from Defendants' violations of ERISA, including lost-opportunity costs;

C.      An order granting equitable restitution and other appropriate equitable monetary relief against Defendants;

D.      Such other equitable or remedial relief as may be appropriate, including the permanent removal of Defendants from any positions of trust with respect to the Plan, the appointment of independent fiduciaries to administer the Plan, and rescission of the Plan's investments in revenue-sharing mutual funds;

E.      An order certifying this action as a class action, designating the Class to receive the amounts restored or disgorged to the Plan, and imposing a constructive trust for

distribution of those amounts to the extent required by law;

   F.  An order enjoining Defendants collectively from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

   G.  An order awarding Plaintiff and the Class their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or the Common Fund doctrine, and post-judgment interest; and

   H.  An order awarding such other and further relief as the Court deems equitable and just.

Respectfully submitted,

**CAPOZZI ADLER, P.C.**

/s/ Donald R. Reavey
Donald R. Reavey, Esquire
Pennsylvania Attorney ID No. 82498
2933 North Front Street
Harrisburg, PA 17110
donr@capozziadler.com
(717) 233-4101
Fax (717) 233-4103
Counsel for the Plaintiff and
the Putative Class
Intent to File a Motion to Appear Pro
Hac Vice Applied for Concurrently with
this Complaint

Date: September 30, 2019

**GUTNICKI, LLC**

/s/ Aharon S. Kaye
Aharon S. Kaye, Esquire
Illinois Attorney ID No. 6291684
4711 Golf Road, Suite 200
Skokie, Illinois 60076
akaye@gutnicki.com
(847) 933-9280
Fax: (847) 933-9285
Entry of Appearance as Local Counsel
Only under LR83.15

Date: September 30, 2019