**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CARL MARTIN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-6463 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| CAREERBUILDER, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Carl Martin brings this putative class action against Defendant CareerBuilder, LLC and dozens of unnamed Defendants. Before the Court is CareerBuilder's motion to dismiss [14] for failure to state a claim. For the reasons set forth below, Defendant CareerBuilder's motion to dismiss [14] is granted, and Plaintiff's complaint is dismissed without prejudice. Plaintiff is given until July 28, 2020 to file an amended complaint consistent with this opinion. If Plaintiff does not file an amended complaint by that deadline (or any extension of it granted by the Court), then the Court will convert the dismissal to "with prejudice" and enter a final judgment under Federal Rule of Civil Procedure 58. If Plaintiff files an amended complaint, Defendants are given until August 25, 2020 to answer or otherwise plead, and a joint status report that includes a briefing schedule on a renewed motion to dismiss and/or a proposed discovery plan (if Defendants file an answer to some or all of the amended complaint) is due no later than September 1, 2020.

I.  **Background**[1]

Plaintiff Carl Martin ("Plaintiff") brings this putative class action against Defendant CareerBuilder, LLC and 42 unnamed Defendants ("Defendants"). Plaintiff was a former employee of Defendant CareerBuilder and participated in its 401(k) defined-contribution retirement plan (the "Plan"). As of 2017, 2,600 employees participated in the Plan, and the Plan had over $180 million in assets. [*Id.*, ¶ 17.]

Each plan is funded by participants' voluntary contributions, which are matched by Defendant CareerBuilder. [*Id.*, ¶ 29.] The Plan offered various investment options into which Plan participants could select to put their retirement contributions. [*Id.*, ¶ 27.] Participants who did not actively select an investment option were placed in a default. [*Id.*]

The Plan's "Recordkeeper and/or Advisor" was "ADP and/or Morgan Stanley." [*Id.*, ¶ 31.] Plaintiff alleges that in defined contribution plans, recordkeepers perform various administrative functions, including maintaining participant account balances and providing a website and telephone number for plan participants to monitor or control their accounts. [*Id.*, ¶¶ 32–34.]

According to Plaintiff, notwithstanding a robust market for recordkeeping services, Defendants paid too much for ADP and/or Morgan Stanley's recordkeeping here. [*Id.*, ¶¶ 34, 36.] Some of the recordkeeping fees are "hard dollar payments," that are explicitly reported. [*Id.*, ¶¶ 44–46.] But recordkeepers can also get fees through "revenue sharing." [*Id.*, ¶ 47.] According to Plaintiff, such sharing is built into the expense ratio of a Fund. [*Id.*, ¶¶ 49–50.] Basically, the listed expense ratio (how many administrative fees are assessed as a proportion of a given fund's assets) includes both the cost of actually administering the fund and recordkeeping costs. [*Id.*, ¶¶ 50, 51.]

---

[1] For purposes of the motion to dismiss, the Court accepts as true all of Plaintiffs' well-pleaded factual allegations and draws all reasonable inferences in Plaintiffs' favor. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

Plan fiduciaries may select funds with higher revenue sharing in order to offset reductions in hard dollar payments. [*Id.*, ¶ 56.] In such instances, revenue sharing might be necessary to cover the cost of running the fund, but it might also generate revenue in excess of the costs of service provision. [*Id.*] Plaintiff also explains that certain share classes "often make revenue sharing payments to cover administrative costs." [*Id.*, ¶ 67.] Here, the average per-capita cost of recordkeeping ranged from a low of $136.39 in 2016 to a high of $222.43 in 2014. [*Id.*, ¶ 64.] Plaintiffs say that a reasonable fee would be $40 per participant. [*Id.*, ¶ 70.]

Plaintiff also has several bones to pick with Defendants' selection and retention of various investment options that he thinks were not up to snuff. [*Id.*, ¶ 74.] First, according to Plaintiff, Defendants had considerable bargaining power, and could (and should) have negotiated "institutional class" funds. These funds are identical to "retail class" versions of the same funds, except that the retail funds charge for the costs of administration. [*Id.*, ¶¶ 77–78, 83.] According to Plaintiff, more than 40% of the funds included in the Plan had institutional (i.e., cheaper) analogues. [*Id.*, 79.] Plaintiff admits, however, that these retail funds were included "so that the Defendants would not incur any additional cost in administering the Plan." [*Id.*, ¶ 85.] Second, Plaintiff claims that the funds included as investment options in the Plan were too expensive. Plaintiff says that cheaper funds were available for 22 of the 23 funds on offer.[2] [*Id.*, ¶ 88.] Forty percent of these funds remained in the Plan for five consecutive years without any change. [*Id.*, ¶ 89.] "[S]ome" of the Plan's funds were outperformed by cheaper analogues. [*Id.*, ¶ 90.] Plaintiff alleges that Defendants included these more expensive, actively managed funds in the Plan so that

---

[2] The one fund without a cheaper analogue was an index fund. See [*id.*, ¶ 88]. Index funds "do not make any independent investment choices but simply track a designated portfolio such as the Standard & Poor's 500 Index." *Loomis v. Exelon Corp.*, 658 F.3d 667, 669–70 (7th Cir. 2011). Because they are passively managed, they are generally cheaper (*i.e.*, have lower expense ratios) than actively managed funds. *Id.*

3

more revenue could be shared with ADP and/or Morgan Stanley. [*Id.*, ¶ 91.] Plaintiff also alleges that the trend in economic and financial literature suggests that passively managed funds such as indexes are generally better investments than more expensive managed funds. [*Id.*, ¶¶ 94–98.] In any event, the expense ratios for the Plans funds ranged from 0.04% to 1.06%. [*Id.*, ¶ 88.]

Plaintiff filed a three-count putative class action, alleging that Defendants violated the fiduciary duties of prudence and loyalty as required by the Employment Retirement Income Security Act of 1974 (ERISA). Plaintiff also brings suit against the unknown defendants, arguing that they should have done a better job of monitoring the Plan's decisionmakers. Defendant CareerBuilder moved [14] to dismiss for failure to state a claim.

## II.     Legal Standard

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (alteration in original). The factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). Dismissal for failure to state a claim under Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts as true all of Plaintiffs'

well-pleaded factual allegations and draws all reasonable inferences in Plaintiffs' favor. *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). However, "[t]o survive a motion to dismiss, the well-pleaded facts of the complaint must allow the court to infer more than the mere possibility of misconduct." *Langworthy v. Honeywell Life & Acc. Ins. Plan*, 2009 WL 3464131, at *2 (N.D. Ill. Oct. 22, 2009) (citing *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011)). Evaluating whether a "claim is sufficiently plausible to survive a motion to dismiss is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *McCauley*, 671 F.3d at 616).

### III. Analysis

ERISA holds plan fiduciaries[3] to a "prudent man standard of care:"

(1) * * * a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

    (A) for the exclusive purpose of:

        (i) providing benefits to participants and their beneficiaries; and

        (ii) defraying reasonable expenses of administering the plan;

    (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

29 U.S.C. 1104(a). Plaintiff alleges violations of both the duty of prudence (subsection (B)) and the duty of loyalty (subsection (A)). The Court begins with the duty of prudence. Plaintiff claims that four allegations together allow for the plausible inference of imprudence: (1) the Plan did not invest in the cheaper "institutional" funds as opposed to the "retail" versions; (2) the Plan included

---

[3] The elements of an ERISA breach of fiduciary duty claim are "(1) a plan fiduciary (2) breaches an ERISA-imposed duty (3) causing a loss to the plan." *Sweda v. University of Pennsylvania*, 923 F.3d 320, 328 (3d Cir. 2019) (citation and quotation marks omitted). For the purposes of this motion at least, Defendants do not contest the first and third element, restricting their analysis to whether Plaintiff has plausibly alleged that an ERISA-imposed duty was breached.

5

expensive funds when it should have included more indexes; (3) 40% of these expensive funds remained in the Plan for five years; and (4) all of these expensive funds helped funnel monies to ADP and/or Morgan Stanley via revenue sharing.

Defendant argues that these allegations are uncannily similar to those made in *Divane v. Northwestern University*, 953 F.3d 980 (7th Cir. 2020), *petition for cert. filed* (U.S. June 23, 2020) (No. 19-1401), where the Seventh Circuit recently affirmed dismissal of an ERISA case. According to Defendant, *Divane* is one in a line of Seventh Circuit cases preventing courts from paternalistically interfering with Plans' slates of funds so long as the fiduciaries don't engage in self-dealing and offer a comprehensive-enough menu of options.

"A fiduciary must behave like a prudent investor under similar circumstances." *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009). Prudence "includes choosing wise investments and monitoring investments to remove imprudent ones." *Allen v. GreatBanc Trust Co.*, 835 F.3d 670, 678 (7th Cir. 2016); see also *Tibbie v. Edison International*, 575 U.S. 523, 135 S. Ct. 1823, 1829 (2015) ("A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones.") That said, "nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)." *Hecker*, 556 F.3d at 586; see also *Loomis*, 658 F.3d 667, 672–73 (7th Cir. 2011) (describing some drawbacks to index funds and the assessment of fees on a per capita, as opposed to per asset, basis); *Davis v. Washington University in St. Louis*, 960 F.3d 478, 486 (8th Cir. 2020) ("But fiduciaries are not required to pick the *best* performing fund. Nor are they required to pick the *lowest*-cost fund * * *. The existence of a cheaper fund does not mean that a particular fund is too expensive *in the market generally* or that it is an otherwise imprudent choice.") (citations and quotation mark omitted). Indeed, the "Supreme Court

has explained that Congress wanted to avoid creating 'a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefits plans in the first place.'" *Divane v. Northwestern University*, 2018 WL 2388118, at \*5 (N.D. Ill. May 25, 2018), *aff'd* 953 F.3d 980, (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996)).

Importantly, the prudence standard is processed-based, not outcome-based. Thus, a Plan's mere underperformance is not actionable so long as the fund administrators acted prudently. *Divane*, 953 F.3d at 922 (quoting *DeBruyne v. Equitable Life Assurance Society of the United States*, 920 F.2d 457, 465 (7th Cir. 1990)). ERISA plaintiffs, however, generally do not have insider information that speaks to process. Thus, "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which she has no access, as long as the facts alleged tell a plausible story." *Allen*, 835 F.3d at 678 (citation omitted); see also *Pension Benefit Guaranty Corp. v. Morgan Stanley Investment Management Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009)) ("Even when the alleged facts do not 'directly address[ ] the process by which the Plan was managed,' a claim alleging a breach of fiduciary duty may still survive a motion to dismiss if the court, based on circumstantial factual allegations, may reasonably 'infer from what is alleged that the process was flawed.'") (alterations in original). At the very least, however, "the plaintiff must plausibly allege action that was objectively unreasonable." *Divane*, 953 F.3d at 988 (citing *Amgen Inc. v. Harris*, 577 U.S. ---, 136 S. Ct. 758, 760 (2016) (per curium)). In applying these various considerations, the Seventh Circuit repeatedly has cautioned that plaintiffs and courts cannot use ERISA to paternalistically dictate what kinds of investments plan participants make where a range of investment options are on offer. See, *e.g.*, *Divane*, 953 F.3d at 989 (quoting *Loomis*, 658 F.3d at 673–74). It has accordingly

7

affirmed dismissal of ERISA complaints alleging that some combination of high fees and under-performing funds signaled imprudence, where the plans in question offered some cheaper alternatives, and the complaint did not include allegations speaking to flawed decision-making or self-dealing. *Divane*, 953 F.3d at 988–92; *Loomis*, 658 F.3d at 671–73 (rejecting the "paternalistic" theory that a Plan should not offer expensive or erratically performing options); *Hecker*, 556 F.3d at 585–87 (holding that revenue sharing is not per se problematic, and that a Plan is not imprudent for offering high-fee funds, so long as it also offers a "mix" of alternatives); see also *Velazquez v. Massachusetts Financial Series Company*, 320 F. Supp. 3d 252, 258–59 (D. Mass 2018) (collecting cases from various circuits and concluding "[t]he principal distinguishing feature between [plaintiff- and defendant-friendly caselaw] is whether or not self-dealing is alleged.").[4]

    Here, Defendants are correct that under binding Seventh Circuit precedent Plaintiff has not adequately pled a breach of the duty of prudence. Preliminarily, *Divane* resolves most of this case.[5] The fund in *Divane* charged fees (partially through revenue sharing) that averaged between $153 and $213 per person, essentially the same as those at issue here (which range from $131.55 to $222.43). *Divane*, 953 F.3d at 984. The Seventh Circuit held that such fees were not inconsistent with prudent portfolio management, particularly when revenue sharing was used to keep mandatory per-capita costs down. *Id.* at 989–90; see also *Loomis*, 658 F.3d at 672 ("A flat-fee

---

[4] Many of Plaintiff's cases are thus distinguishable in that they involved allegations of self-dealing. See *Leber v. Citigroup, Inc.*, 2010 WL 935442, at *13–14 (S.D.N.Y. Mar. 16, 2010) (allowing self-dealing theories to proceed, but finding all other generalized allegations of underperformance and unreasonable fees to be inadequately pled); see also *Urakhchin v. Allianz Asset Management of America, L.P.*, 2016 WL 4507117, at *4, 7 (C.D. Cal. Aug. 5, 2016); *Johnson v. Fujitsu Technology and Business of America, Inc.*, 250 F. Supp. 3d 460, 463, 466 (N.D. Cal. 2017); *Moreno v. Deutsche Bank Americas Holding Corp.*, 2016 WL 5957307, at *6 (S.D.N.Y. Oct. 13, 2016).

[5] Of course, the Court must view the Complaint holistically, and cannot view circumstantial allegations of imprudence in isolation from each other. But, as *Divane* clarifies, the Seventh Circuit has repeatedly explained that many of Plaintiff's allegations do not speak to imprudence at all, or at the very least require significant elaboration.

structure might be beneficial for participants with the largest balances, but, for younger employees and others with small investment balances, a capitation fee could work out to more, per dollar under management, than a fee between 0.03% and 0.96% of the account balance.").[6] Likewise, *Divane* clarified that a fund's failure to invest in institutional as opposed to retail funds does not give rise to an inference of imprudence when a plan offers cheaper alternatives. *Divane*, 953 F.3d at 991–92; see also *Loomis*, 658 F.3d at 671 (rejecting the argument that ERISA's fiduciary duties require employers to shoulder the costs of administering funds themselves). *Divane* also reiterated that a plan is not required to offer *only* index funds—it's not a breach of fiduciary duty to include high-fee funds along with cheaper funds so long as the "fiduciary's overall performance" is not deficient. *Divane*, 953 F.3d at 992 (distinguishing *Sweda v. University of Pennsylvania*, 923 F.3d 320, 330 (3d Cir. 2019)); *cf. Davis*, 960 F.3d at 485 (comparing, for example, a real-estate index fund to an actively managed real-estate fund is "[c]omparing apples to oranges" because "[t]hey have different aims, different risks, and different potential rewards that cater to different investors."). So too here: without more, Plaintiff cannot proceed on its allegations that revenue sharing was too high, only institutional class funds should be on offer, and the Plan should offer exotic index funds.[7]

---

[6] An inference of imprudence based on the average cost of recordkeeping is even less plausible here than in *Divane*, because Defendants' Plan is smaller and has fewer participants. Here, then, there are fewer economies of scale, and Defendants had less leverage to negotiate smaller fees. Likewise, Plaintiff admits that revenue sharing was necessary at least to some degree to offset reductions in per-capita costs and pay for aspects of Plan administration. Plaintiff's allegations about excessive costs are entirely speculative, and the Court need not take these conclusory allegations as true in deciding this motion to dismiss.

[7] *Divane*'s specific holdings on these fronts render most of Plaintiff's cases inapposite (to the extent that these cases even held the ERISA plaintiffs stated a claim for excessive fees in the first place). See *Bell v. Pension Committee of ATH Holding Company, LLC*, 2017 WL 1091248, *3–*4 (S.D. Ind. Mar. 23, 2017) (allowing claim related to institutional class fees to proceed); *Henderson v. Emory University*, 252 F. Supp. 3d 1344, 1349 (N.D. Ga. 2017) (same); *Nicolas v. Trustees of Princeton University*, 2017 WL 4455897, at *4 (D.N.J. Sept. 25, 2017) (allowing unreasonable administration and management fee claim to proceed in part because of allegations related to institutional class funds); *Troudt v. Oracle Corporation*, 2017 WL 663060, at *1, *7 (D. Col. Feb. 16, 2017), objections overruled 2017 WL 1100876 (D. Col. Mar. 22, 2017),

Plaintiff's attempts to distinguish *Divane* are unconvincing.[8] First, Plaintiff claims that there were many more funds at issue in *Divane* (400) than here (23). Presumably, Plaintiff reasons that in *Divane*, Northwestern's decision to include hundreds of suspect funds was OK because they also included lots of other good funds. This argument, however, ignores that *Loomis* and *Hecker* held that funds offering the same general number of options as here are insulated from speculative suits such as this so long as they offer a mix of options and there are no other allegations speaking to imprudence.[9] *Loomis*, 658 F.3d at 669 (affirming dismissal of complaint related to plan offering

---

(allowing claim to proceed based on the theory that recordkeeping fees should be charged on a per-capita basis as opposed to asset based formulae); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 476 (M.D.N.C. 2015) (allowing institutional class fees theory to proceed, though it was "a close call"); see also *Daugherty v. University of Chicago*, 2018 WL 1805646, at *2 (N.D. Ill. Jan. 10, 2018) (analyzing allegations about institutional classes and revenue sharing through the lens of *standing*, not failure to state a claim); *Johnson*, 250 F. Supp. 3d at 463, 466 (allowing excessive fees claim to proceed when plaintiffs alleged self-dealing and that defendants' plan was extravagantly expensive relative to comparable plans, with recordkeeping costs five to ten times higher than others); *Moreno*, 2016 WL 5957307, at *6 (same); *Main v. American Airlines Inc.*, 248 F. Supp. 3d 786, 793–94 (N.D. Tex. 2017) (dismissing plaintiff's prudence count insofar as it pertained to the fiduciaries' failure to consider lower-cost alternatives to mutual funds, but allowing excessive fees claim to proceed where plaintiffs alleged that very similar funds using similar investment styles on similar assets were an order of magnitude cheaper).

[8] Plaintiff relies primarily upon an out-of-circuit district-court opinion that distinguished *Divane*. See generally *Pinnell v. Teva Pharmaceuticals USA, Inc.*, 2020 WL 1531870 (E.D. Penn. Mar. 31, 2020). It goes without saying that the Court is bound by *Divane*, *Loomis*, and *Hecker* and not *Pinnell*. Likewise, whereas this Court must be particularly attentive to the nuances of Seventh Circuit law, the *Pinnell* court needed to be apply Third Circuit law. Though the approach taken by the Third Circuit is "not inconsistent" with what this Court must do, see *Divane*, 953 F.3d at 922, the circuits have differed on how to deal with some of the nitty-gritty details of Plan design. Compare, *e.g.*, *Divane*, 2018 WL 2388118, at *8 (dismissing complaint because seven out of hundreds of investment options had low fees); *Divane*, 953 F.3d at 921 (fiduciaries' failure to offer institutional options not actionable), with *Sweda*, 923 F3d at 330 ("Such a standard would allow a fiduciary to avoid liability by stocking a plan with hundreds of options, even if the majority were overpriced or underperforming."); *id.* at 331–32 (allowing complaint to proceed in part because of allegations related to fiduciaries' failure to invest in institutional options). In any event, others have argued that *Divane* imposes a different pleading standard on ERISA plaintiffs than *Sweda* or the Eighth Circuit's decision in *Davis v. Washington University in St. Louis,* 960, F.3d 478 (8th Cir. 2020). See generally Petition for Writ of Certiorari, *Hughes v. Northwestern University*, (No. 19-1401), docketed June 23, 2020.

[9] Ironically, the *Divane* plaintiffs emphasized the number of options to distinguish their case from prior precedent. See *Divane v. Northwestern University*, Case No. 16-cv-8157 [66 at 23 (quoting *Hecker*, 569 F.3d at 711, for the proposition that it is "improper to include 'a very large number of investment alternatives' in a plan while 'shifting to the participants the responsibility for choosing among them.'")

10

32 investment options); *Hecker*, 556 F.3d at 579, 586 (affirming dismissal of complaint related to plan offering 26 direct investment options and a brokerage window through which other funds could be purchased). Second, Plaintiff argues that, like the plaintiffs in *Divane*, they should get a crack at discovery before the Court dismisses this complaint. This argument has it backwards. The Court must dismiss speculative suits "lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value." *Twombly*, 550 U.S. at 558; see also *Divane*, 953 F.3d at 988 (quoting *Iqbal*, 556 U.S. at 678–79) ("the notice-pleading rule 'does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions'"); *cf. Sweda*, 923 F.3d at 334 (rejecting concerns about burdensome discovery because the complaint was "detailed and specific" about the fiduciaries' failures). To be sure, *Divane* did consider Northwestern's competing explanations for its fees, but, as here, those explanations were either apparent on the face of the complaint or presumably comported with common sense. See *Divane*, 953 F.3d at 989; [1, ¶¶ 56, 67, 85]; see also *McCauley*, 671 F.3d at 616. Indeed, *Divane* was decided on a Rule 12(b)(6) motion to dismiss, and thus took all of the plaintiffs' well-pled allegations as true and made all reasonable inferences in their favor.

All that remains is Plaintiff's attempt to thread the needle between *Divane* and the Third Circuit's recent decision in *Sweda v. University of Pennsylvania*, 923 F.3d 320 (3d Cir. 2019), regarding the maintenance of poorly performing funds. The Seventh Circuit has explained that, at least for this Court's purposes, what sets *Sweda* apart from *Divane*, *Loomis*, and *Hecker* were the allegations about "the fiduciary's overall performance," which permitted the plausible inference that the fiduciary was imprudent. *Divane*, 953 F.3d at 992.

11

In *Sweda*, the complaint alleged that the plan in question imprudently maintained its underperforming slate despite the availability of some cheaper and better alternatives. 923 F.3d at 330–32. It is true that, as in *Sweda*, Plaintiff here has alleged that the Plan failed to offer cheaper (passively managed) funds that are comparable to the actively managed analogues provided by the Plan. But Plaintiff's allegations on this front are a far cry from the "detailed and specific" factual allegations that made it past a motion to dismiss in *Sweda*. *Id.* at 334. Indeed, in *Sweda*, the plaintiffs included "numerous and specific factual allegations," and "offered specific comparisons between returns on Plan investment options and readily available alternatives, as well as practices of similarly situated fiduciaries to show what plan administrators 'acting in a like capacity and familiar with such matters would [do] * * *.'" *Sweda*, 923 F.3d at 332 (quoting 19 U.S.C. § 1104(a)(1)(B)). The *Sweda* plaintiffs buttressed their complaint with the allegation that Penn "failed to remove underperformers" and provided specific examples of these lapses. *Id.* at 331. These allegations permitted the inference of imprudence—it was plausible that the University of Pennsylvania had a flawed process given that it, anomalously among its peers, retained clunker funds notwithstanding the availability of cheaper and higher performing alternatives.[10]

Here, however, Plaintiff only alleges that "some" of the funds under-performed their cheaper counterparts, and then goes on to explain that Defendants removed or modified a majority of the funds over a five-year period. It is hard to make out what part of this was "objectively unreasonable." *Divane*, 953 F.3d at 988); see also *Davis*, 960 F.3d at 485–86 (citing, *inter alia*, *Hecker*, 556 F.3d at 586) (dismissing far more detailed complaint because at the end of the day

---

[10] The specificity and scope of the allegations at issue also distinguish the case at bar from *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057 (N.D. Cal. 2017). In *Terraza*, the plaintiff alleged that the employer retained an overpriced slate of investment options, even though "almost all of the investment options [] underperformed compared to their benchmark." *Id.* at 1076; see also *Lorenz v. Safeway, Inc.*, 241 F. Supp. 3d 1005, 1019 (N.D. Cal. 2017) (allowing a similar complaint to go forward).

one cannot plausibly infer imprudence from the mere fact that fiduciaries failed to go with the cheapest possible option). If anything, these allegations suggest that Defendants *did* have a prudent process, because they removed or modified a majority of the funds. Perhaps an imaginative reader could spin a speculative yarn as to Defendants' imprudence, but that is not the standard at a Rule 12(b)(6) motion to dismiss. See *Swanson v. Citibank, N.A.*, 614 F.3d 400, 403 (7th Cir. 2010). And Defendants' failure to offer every index fund under the sun is not, in and of itself, imprudent, so long as the Plan offers a mix of investments and there are no other indicia of a flawed process. Here, the Plan offers an acceptable mix of options, with expense ratios that range from 0.04% to 1.06%. See *Loomis*, 658 F.3d at 669 (ranging from 0.03% to 0.96%); *Hecker*, 556 F.3d at 586 (ranging from 0.07% to just over 1%); *Divane*, 2018 WL 2388118, at *3 (ranging from 0.05% to 1.89%); see also *Davis*, 960 F.3d at 485–86 (discussing the fact that non-market index funds with similar names to actively managed funds have different strategies and may invest in different types of assets altogether). Because "it would be beyond the court's role to seize ERISA for the purpose of guaranteeing individual litigants their own preferred investment options," Plaintiff's duty of prudence claim must be dismissed. See *Divane*, 953 F.3d at 989 (emphasis added); see also *Hecker*, 556 F.3d at 586.

     Plaintiff's remaining claims fall as well. Plaintiff argues that he has adequately alleged a duty of loyalty claim based on the same facts as the duty of prudence claim. This argument fails because most courts require something more, such as an allegation supporting an inference of self-dealing, to survive a motion to dismiss. See, *e.g.*, *Nicolas v. Trustees of Princeton University*, 2017 WL 4455897, at *3 (D.N.J. Sept 25, 2017) (dismissing loyalty count because "Plaintiff pleads no facts suggesting Defendant benefitted, financially or otherwise, from any decisions related to the Plans or engaged in disloyal conduct in order to benefit itself or someone other than the Plans'

13

beneficiaries; rather, Plaintiff's loyalty claims are merely characterizations that piggyback off of the prudence claims, without any independent factual predicate."); *Sacerdote v. New York University*, 2017 WL 3701482, at *5 (S.D.N.Y. Aug. 25, 2017) (citing, *inter alia*, Restatement (Third) of Trusts § 78 (2007) ("a plaintiff must do more than simply recast purported breaches of the duty of prudence as disloyal acts"); *Daugherty v. University of Chicago*, 2017 WL 4227942, at *9 (N.D. Ill. Sept. 22, 2017) (dismissing duty of loyalty count because "Plaintiffs do not plausibly allege that Defendant engaged in any self-dealing or failure to communicate material information.") In any event, even if the standard for pleading prudence was the same as that for pleading loyalty, *cf. Henderson v. Emory University*, 252 F. Supp. 3d 1344, 1357 (N.D. Ga. 2017), Plaintiff's loyalty claim would fail for the reasons set out above. Finally, Plaintiff's monitoring claim fails because he has not adequately alleged an underlying fiduciary breach in the first place. See, *e.g.*, *White v. Chevron Corporation*, 2017 WL 2352137, at *22 (N.D. Cal. May 31, 2017) (dismissing "derivative" duty to monitor claim, because no underlying fiduciary breach had been adequately alleged).

As a final housekeeping note, Defendants moved to dismiss with prejudice. That would be overkill. Although Seventh Circuit precedent dictates that some of Plaintiff's allegations are insufficient to state a claim for breach of fiduciary duty on their own, Rule 15 and circuit precedent counsel in favor of allowing an amended pleading here, as it is by no means clear that amendment would be futile.

IV. **Conclusion**

For the reasons stated above, Defendant's motion to dismiss [14] is granted, and Plaintiff's complaint is dismissed without prejudice. Plaintiff is given until July 28, 2020 to file an amended complaint consistent with this opinion. If Plaintiff does not file an amended complaint by that

deadline (or any extension of it granted by the Court), then the Court will convert the dismissal to "with prejudice" and enter a final judgment under Federal Rule of Civil Procedure 58. If Plaintiff files an amended complaint, Defendants are given until August 25, 2020 to answer or otherwise plead and a joint status report that includes a briefing schedule on a renewed motion to dismiss and/or a proposed discovery plan (if Defendants file an answer to some or all of the amended complaint) is due no later than September 1, 2020.

Dated: July 1, 2020

_____
Robert M. Dow, Jr.
United States District Judge